**AGREED-UPON REDACTED COPY**
**- MAY BE MADE PUBLIC**

**PROTECTED INFORMATION**
**TO BE DISCLOSED ONLY IN ACCORDANCE WITH**
**U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

BID PROTEST

| | |
|---|---|
| HAMILTON SUNDSTRAND POWER SYSTEMS,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 06-874C<br><br>(Judge Bruggink) |

DEFENDANT'S MOTION TO DISMISS
FOR LACK OF JURISDICTION, CROSS-MOTION FOR
JUDGMENT UPON THE ADMINISTRATIVE RECORD, AND OPPOSITION TO
PLAINTIFF'S MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

MARK A. MELNICK
Assistant Director

TIMOTHY P. MCILMAIL
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D.C. 20530
Telephone: (202) 616-0342
Facsimile: (202) 514-7965

OF COUNSEL:
MAJOR JOHN G. TERRA
Trial Attorney
United States Air Force
Arlington, VA

January 17, 2007

Attorneys for Defendant

TABLE OF CONTENTS

PAGE(S)

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . iii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . 1

QUESTIONS INVOLVED . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . 2

I. Nature Of The Case . . . . . . . . . . . . . . . . . . 2

II. Statement Of The Facts . . . . . . . . . . . . . . . . 3

A. The Request For Proposals . . . . . . . . . . . . 3

B. The Proposals . . . . . . . . . . . . . . . . . . 7

C. The Competitive Range, Contract Award, And Protests . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

I. The Court Should Dismiss This Protest Because HSPS Does Not Establish Standing To Challenge The Contract Award . . . . . . . . . . . . . . . . . 20

II. Even If HSPS Possesses Standing, The Court Should Grant Judgment in Favor Of The Government Because HSPS Does Not Meet The Requirements For An Injunction . . . . . . . . . . . 23

A. Standard Of Review . . . . . . . . . . . . . . . 23

B. HSPS Does Not Succeed On The Merits Because The Government Reasonably Excluded It From The Competitive Range . . . . . . . . . . . . . . . . . . . . . 25

C. Even If The Government Treated HSPS Unequally In Some Respects, HSPS Does Not Succeed On The Merits Because It Does Not Establish That It Has Suffered Prejudice . . . . . . . . . . . 36

D. Because This Is A National Security Procurement That HSPS Has Waited Months To Challenge In This Court, The Balance Of Hardships And The Public Interest Favor Denial Of Injunctive Relief . . . . . . . . . . . . . . . . 38

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . 41

CERTIFICATE OF FILING

TABLE OF CONTENTS

PAGE(S)

Baltimore Gas & Electric Co. v. Natural Resource Defense Council, Inc., 462 U.S. 87 (1983) . 24

Banknote Corp. of America, Inc. v. United States, 56 Fed. Cl. 377 (2003), aff'd, 365 F.3d 1345 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . 24

Bannum, Inc. v. United States, 404 F.3d 1346 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . 24

C.A.C.I., Inc.-Federal v. United States, 719 F.2d 1567 (Fed. Cir. 1983) . . . . . . . . . . . . . . . . 21, 23

Cincom Systems v. United States, 37 Fed. Cl. 266 (1997) . . . . . . . . . . . . . . . . . . . . . 39

E.W. Bliss Co. v. United States, 77 F.3d 445 (Fed. Cir. 1996) . . . . . . . . . . . . . . . . . . 24

Galen Medical Associates, Inc. v. United States, 369 F.3d 1324 (Fed. Cir. 2004) . . . . . . . . . . . . . 23, 24, 25

Gentex Corp. v. United States, 58 Fed. Cl. 634 (2003) . . . . . . . . . . . . . . . . . . . . 38, 39

Greenleaf Construction Co., Inc. v. United States, 67 Fed. Cl. 350 (2005) . . . . . . . . . . . . . . . . . . . . . 22

Griffy's Landscape Maintenance LLC v. United States, 46 Fed. Cl. 257 (2000) . . . . . . . . . . . . . . . . . . . . . 25

Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1333 (Fed. Cir. 2001) . . . . . . . . . . . . . 21

Information Technology and Applications Corp. v. United States, 51 Fed. Cl. 340 (2001) . . . . . . . . . . . 23

KSEND v. United States, 69 Fed. Cl. 103 (2005), aff'd, 184 Fed. App'x 956 (Fed. Cir. 2006) (unpublished table decision) . . . . . . . . 26

ManTech Telecommunications and Information Systems Corp. v. United States, 49 Fed. Cl. 57 (2001), aff'd, 30 Fed. App'x 995 (Fed. Cir. 2002) (unpublished table decision) . . . . . . . . . . . . . . . . . 25

NCLN20, Inc., 2001 WL 930722, B-287,692, 2001 CPD ¶ 136 (Comp. Gen. 2001) . . . . . . . . . . . . . . . . 27

PGBA, LLC v. United States, 389 F.3d 1219 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . 23

Rex Service Corp. v. United States, 448 F.3d 1305 (Fed. Cir. 2006) . . . . . . . . . . . . . . . . 21

Ryan Co. v. United States, 43 Fed. Cl. 646 (1999) . . . . . . . . . . . . . . . . . . . . 26

Seattle Security Services, Inc. v. United States, 45 Fed. Cl. 560 (2000) . . . . . . . . . . . . . . . . . . . . 20

Taylor v. United States, 303 F.3d 1357 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . 20

United States v. IBM Corp., 892 F.2d 1006 (Fed. Cir. 1989) . . . . . . . . . . . . . . . . 21

STATUTES

28 U.S.C. § 1491(b)(3) . . . . . . . . . . . . . . . . . . . . 38

31 U.S.C. § 3553(d)(3)(A) . . . . . . . . . . . . . . . . . . . 39

31 U.S.C. § 3553(d)(3)(B) . . . . . . . . . . . . . . . . . . . 39

REGULATIONS

FAR § 15.306 . . . . . . . . . . . . . . . . . . . . . . . 25

FAR § 15.306(d) . . . . . . . . . . . . . . . . . . . . . . 25

FAR § 15.306(e)(1) . . . . . . . . . . . . . . . . . . . . 26

RULES

Rule 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC") . . . . . . . . . . . . . . . . . . 1

RCFC 52.1 . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**PROTECTED INFORMATION**
**TO BE DISCLOSED ONLY IN ACCORDANCE WITH**
**U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

BID PROTEST

| | | |
|---|---|---|
| HAMILTON SUNDSTRAND POWER SYSTEMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 06-874C |
| v. | ) | |
| | ) | (Judge Bruggink) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S MOTION TO DISMISS
FOR LACK OF JURISDICTION, CROSS-MOTION FOR
JUDGMENT UPON THE ADMINISTRATIVE RECORD, AND OPPOSITION TO
PLAINTIFF'S MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD

INTRODUCTION

Pursuant to Rule 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, requests that the Court dismiss this action for lack of subject matter jurisdiction. In the alternative, the Government requests that the Court deny the motion for judgment upon the administrative record filed by plaintiff, Hamilton Sundstrand Power Systems ("HSPS")[1], and grant judgment upon the administrative record in favor of the Government, pursuant to RCFC 52.1.

---

[1] The Court's December 29, 2006 order converted HSPS's motion for a preliminary injunction to a request for permanent injunction and a motion pursuant to RCFC 52.1.

## QUESTIONS INVOLVED

1. Whether the Court possesses subject matter jurisdiction to entertain this challenge to a contract award, where HSPS does not allege or demonstrate either that its proposal was technically acceptable and therefore eligible for an award, or that the proposals of the contract awardee and the other offerors included in the competitive range were technically unacceptable.

2. Whether, if the Court possesses jurisdiction, the Court should enjoin further performance of a contract awarded for a Large Aircraft Start System upon HSPS's argument that the Government treated its proposal unequally in excluding it from the competitive range as technically unacceptable, where, among other things, HSPS did not submit a detailed design of the system that it was proposing in response to the Government's request for detailed proposals.

## STATEMENT OF THE CASE

### I. Nature Of The Case

In this post-award bid protest action, HSPS challenges the Government's decision to exclude it from the competitive range for the award of a contract, as well as the award of the contract to another offeror.

## II. Statement Of Facts

### A. The Request For Proposals

On June 20, 2005, the Government, through the United States Air Force, issued a request for proposals for a Large Aircraft Start System ("LASS"). AR 73.[2] The LASS is a four-wheeled, towable vehicle consisting of an enclosure assembly, fuel system, electrical system, lubrication system, frame and running gear, and air delivery system. AR 194 ¶ 1.1. The LASS's primary use is to start engines for a variety of aircraft in the inventory of the Air Force. See id.

The request for proposals ("RFP") required the submission of proposals in three separate volumes, one of which would contain the offeror's technical proposal. AR 135. The RFP states that "[t]his acquisition will utilize the Technically Acceptable-Risk/Performance/Price Tradeoff (TA-RPPT) source selection procedure to make an integrated assessment for a best value award decision. A decision on the technical acceptability of each offeror's proposal will be made. For those offerors who are determined to be technically acceptable, tradeoffs will be made between proposal risk, past and present performance and price." AR 139 ¶ 1. The RFP states that "[a]ward will be made to the one responsible offeror whose proposal conforms to all solicitation

[2] "AR" refers to the administrative record filed in this case on January 5, 2007.

requirements . . . and also provides the best value to the Government." Id.

In addition, the RFP states that the Government intended to make an award without discussions, but that discussions would be conducted if necessary. Id. Indeed, the Government conducted discussions, in the form of evaluation notices, including with Hamilton Sundstrand. AR 412, 691, 977, 1227.

Regarding technical acceptability, the RFP states that "[e]ach offeror's technical proposal will be evaluated to determine if the offeror provides a sound, compliant approach that meets all the requirements of [the PD] and also demonstrates a thorough knowledge and understanding of those requirements and their associated risks." AR 139 ¶ 2. The RFP states that the evaluation of each offeror's technical capability would be based upon an analysis of three technical subfactors: enclosure design, air flow system design and operation, and mobility. AR 139-40 ¶ 2.

The RFP states that the standard for the enclosure design subfactor "is met when the offeror demonstrates a sound and feasible methodology of how the proposed configuration complies with the requirements of paragraph 3.3 and section 3.4 and all the subsections of these sections of [the PD], and the configuration demonstration includes an acceptable narrative description of the chassis design and elevation layouts with

major components identified." AR 139 ¶ 2. The PD, PD04WRLEEG21, at ¶ 3.3.1, provides that "[a]n identification plate, permanently marked, shall be securely attached to the Large Aircraft Start System (LASS) in a readily accessible location." AR 146. Paragraph 3.3.2 provides that "[t]he contractor shall place all operating controls and gages on one control panel unless authorized by the government. Users shall have access to make maintenance adjustments to components on control panel." Id. Paragraph 3.3.3 provides that "Step by Step Operating instructions for startup/shut down will be mounted either on the control panel door or another suitable location close to the control panel for easy viewing by the operator." Id.

Paragraph 3.3.5 of the PD provides that "[m]aterial design is required to reduce the extensive man hours and costs expended resolving corrosion-related issues . . . with an objective to utilize composite materials to the maximum extent possible." AR 147. "Wherever practical, dissimilar metals will not be used in direct contact with each other." Id. Paragraph 3.3.6 of the PD provides that "[t]he size and weight of the LASS shall be as small as possible while still meeting the performance requirements as specified." AR 147. Paragraph 3.4 provides that "[t]he maximum gross weight without fluid or fuel shall be as small as possible." Id.

Paragraph 3.3.7 provides that "[t]he LASS shall be designed in a manner which allows the operator and maintainer to perform their task in the most efficient manner. Components shall be designed by shape or by mounting pattern to prevent improper installation." Id. Paragraph 3.3.8 of the PD provides that "[a]ny metal cap, plug, pin, or plate, requiring removal for inspection, service or operation, shall be retained by wire rope or lanyard chain, so it cannot become separated." Id.

Regarding technical acceptability, the RFP states that the standard for the air flow system design and operation factor "is met when the offeror demonstrates in acceptable and detailed methodology how the proposed configuration complies with the requirements of paragraph 3.6.1, 3.6.9, and 3.7.11 of [the PD]." AR 139. Paragraph 3.6.9 provides that "[t]he cart's delivery hose" shall be "the standard bleed air hose 30ft. (100ft. availability) long with quick disconnect and lanyard chain." AR 149.

Regarding technical acceptability, the RFP states that the standard for the mobility subfactor "is met when the offeror demonstrates how the proposed configuration complies with paragraphs 3.5, 3.6.14, 3.6.15 and 3.13 of [the PD], and such demonstration includes an acceptable flow diagram with controls and significant components identified, and a comprehensive and accurate description of operational and safety controls."

AR 140. Paragraph 3.5 of the PD provides that "[t]he LASS . . . shall be towable at speeds up to 15 mph, with a 20-foot maximum safe turning radius," and that "each tie down point will have a minimum clear opening of 1-1/2 inches." AR 148. "The unit shall be capable of being configured for air shipment in less than 10 minutes. The user shall be able to reassemble to towing configuration in less than 5 minutes." Id.

Paragraph 3.6.14 provides that "[w]heels shall be of the pneumatic type that will absorb vibration while the LASS are transported." AR 150. "The wheels will need to be able to transport the LASS while it is in operational and transport mode. The LASS shall have a braking system that shall be hand/foot operated which shall not allow the LASS to move on a slope of 15 degrees." Id. Paragraph 3.6.15 provides that "[t]he LASS shall be designed to be air, land, and sea transportable with four cargo tie downs for LASS retention. Each cargo tie down shall have a minimum operating load capability of twice the weight of the LASS." Id.

B. The Proposals

Five offerors, including HSPS, Science and Engineering Services, Inc. ("SESI"), BAE Systems Aircraft Control, Inc. ("BAE"), and HoveCo, submitted proposals. AR 416, 697, 984, 1235. HSPS's proposal included [redacted]

[redacted][3] AR 497-506.

The Government brought to HSPS's attention that its technical proposal "[redacted]. AR 323. HSPS responded that: "[redacted]" Id.

HSPS continued that it was "[redacted]" Id. It explained that "[redacted]" Id. HSPS's response included [redacted]

---

[3] Highlighting or shading denotes protected material.

[redacted]. AR 324. Rather, HSPS explained that "[redacted]," and that "[redacted]." AR 325.

HSPS's technical proposal (AR 476-506), did not [redacted] Paragraph 3.6.5 of the PD provides that "[t]he fuel tank shall be designed to provide enough fuel for continuous operations under combination loading for minimum of (4) hours" (AR 148), but HSPS's proposal, which [redacted] (AR 493)." HSPS later indicated that [redacted] (AR 319), but [redacted].

In addition, although HSPS provided a table (AR 495) that indicated that [redacted]. HSPS's table [redacted]

[redacted], despite the requirement set forth in PD ¶ 3.4 that "[t]he maximum gross weight without fluid or fuel shall be as small as possible." AR 147 (emphasis added).

HSPS's technical proposal [redacted]." AR 494. When the Government requested more information on [redacted]." AR 327. HSPS's proposal also [redacted]." AR 490. By contrast, BAE explained that [redacted]. AR 1046 ¶ 2.3.4.

Although HSPS's technical proposal indicated that its LASS [redacted], as required by PD ¶ 3.6.9 (AR 149). Even after the Government requested that HSPS verify that [redacted]." AR 320. Although

HoveCo [redacted]" (AR 1293), and, elsewhere in its proposal, explained that "[redacted]" AR 1284.

HSPS's proposal [redacted]. Specifically, HSPS [redacted].

AR 476-506.

With respect to [redacted]" AR 372. With respect to [redacted]." AR 482.

By contrast, SESI stated that its unit [redacted]," explaining that "[redacted]." AR 783. SESI further explained that "[redacted]." Id. In response to an evaluation notice, HoveCo explained that "[redacted]." AR 1211.

When the Government brought to HSPS's attention that [redacted], HSPS initially

indicated that "[redacted]," that "[redacted]," and that "[redacted]" AR 372. HSPS indicated that [redacted]." Id. When the Government informed HSPS that its response did not provide sufficient detail, HSPS answered that "[redacted]." AR 328. HSPS continued that it was "[redacted]." Id.

By contrast, with regard to the requirement that [redacted], SESI explained that [redacted]." AR 782-83. HoveCo explained that [redacted]." AR 1297.

In addition, although in the introduction to its technical proposal SESI explained [redacted]" it further explained that its LASS was [redacted] AR 757-59, 762-86. Regarding PD ¶ 3.6.14, SESI described a "[redacted]. AR 783. SESI further explained that "[redacted]." Id. Regarding PD ¶ 3.6.15, SESI explained that its LASS "[redacted]," and that "[redacted]." AR 785. Implicitly referring to the requirement set forth in PD ¶ 3.6.5, SESI explained that [redacted]." AR 763.

HoveCo explained that "[redacted]." AR 1297. Referring to drawings of its design (found at AR 1276 and AR 1307), HoveCo explained that "[redacted]

[redacted]," and that "[redacted]." AR 1297.

Furthermore, with regard to the requirement that [redacted], SESI explained that [redacted]." AR 780. SESI also explained that "[redacted]." Id. HoveCo explained that its "[redacted]," and that [redacted]." AR 1297.

Moreover, unlike HSPS, SESI responded to requests from the Government for more information with descriptions of plans that [redacted]. When the Government brought to SESI's attention that its proposal [redacted], and "[redacted], SESI explained that, [redacted]

[redacted]," and that "[redacted]." AR 675.

With respect to [redacted], SESI explained that it "[redacted]." Id. By contrast, HSPS responded to the Government's request for additional information with statements such as "[redacted]" (AR 323, 328), and that it would [redacted]" (AR 325).

HSPS's technical proposal did not include any flow diagram or other type of diagram with controls and significant components of the mobility system identified, as required by the RFP. When the Government brought this to HSPS's attention, it responded that it did not understand what the Government was requesting and asked, "What is a 'flow diagram' of the mobility system?" AR 328. The proposals of BAE, SESI, and HoveCo, by contrast, all included diagrams that indicated controls and significant components of the mobility system. AR 779, 784, 1075, 1276, 1307.

In Evaluation Notice ("EN") No. T-HC-2, the Government asked HoveCo, referring to [redacted]." AR 1224. In response, HoveCo identified "[redacted]" as [redacted]," and explained that it planned [redacted]." Id.

The Government determined that HoveCo's technical proposal was technically acceptable for mobility because it provided "a sufficiently detailed description of how the proposed configuration meets the cited paragraphs of the PD," including "[a]n acceptable flow diagram." AR 1346. The Government also determined, however, that "[redacted]," and that HoveCo's answer to EN No. T-HC-2 [redacted]. AR 1345-46. The Government determined that HoveCo's technical proposal presented

[redacted]. AR 1340, 1346.

C. <u>The Competitive Range, Contract Award, And Protests</u>

On July 10, 2006, the Government excluded HSPS and another offeror from the competitive range for the RFP, determining them to be technically unacceptable based upon the final evaluation of the technical proposals and the responses to the Government's evaluation notices. AR 818. The Government informed HSPS of the decision on July 11, 2006. AR 298. As a result of the Government's July 10, 2006 decision, the SESI, BAE, and HoveCo comprised the competitive range. <u>Id.</u>

The Government determined that HSPS's proposal was technically unacceptable because [redacted]." AR 1327. Among the informational deficiencies the Government relied upon were the failure [redacted]

[redacted], and (10) to provide a flow diagram identifying controls and significant components of the mobility system. AR 300-02, 1332, 1334, 1337.

The Government also noted the failure of the proposal to provide detailed information on compliance with the requirement that the LASS have [redacted]. AR 302, 1337.

On August 28, 2006, the Government awarded the contract to SESI. AR 1462. HSPS filed a protest with the Air Force on July 20, 2006. AR 839. The Air Force denied that protest on

August 25, 2006. AR 837. HSPS filed a protest with the Government Accountability Office ("GAO") on September 1, 2006. AR 30. In addition to arguing that it had been treated unequally (AR 1639-40), HSPS argued, referring to the RFP's standard for a technically acceptable proposal (AR 139 ¶ 2), that it "satisfied the RFP's overall requirement of demonstrating a 'sound, compliant approach . . . [and] a thorough knowledge and understanding of th[e] requirements and their associated risks." AR 34 (bracketed material in the original). HSPS also argued that "[u]nder any reasonable technical evaluation, HSPS's stated intent to comply with minor, precisely-specified system requirements should have been deemed acceptable." AR 36.

The GAO denied the protest on December 8, 2006. AR 1602, 1611. HSPS commenced this action on December 22, 2006. On December 27, 2006, the Government ordered its first two LASS units from SESI. AR 1613, 1615-16.

## ARGUMENT

### I. The Court Should Dismiss This Protest Because HSPS Does Not Establish Standing To Challenge The Contract Award

The Court should dismiss this protest for lack of subject matter jurisdiction because HSPS does not establish standing to challenge the award of the contract to SESI. A plaintiff bears the burden of showing jurisdiction by a preponderance of the evidence. Taylor v. United States, 303 F.3d 1357, 1359 (Fed. Cir. 2002). To come within the Court's bid protest jurisdiction,

a protester is required to establish that it possesses the requisite direct economic interest. Rex Service Corp. v. United States, 448 F.3d 1305, 1307 (Fed. Cir. 2006). A disappointed bidder must show that it was within the zone of active consideration for an award. See C.A.C.I., Inc.-Federal v. United States, 719 F.2d 1567, 1575 (Fed. Cir. 1983).

An offeror does not, simply by virtue of having submitted a proposal, possess standing to challenge the award of a contract; for example, a protester whose bid is not responsive to a solicitation does not possess standing to challenge an award to another offeror. United States v. IBM Corp., 892 F.2d 1006, 1012 (Fed. Cir. 1989). In order to demonstrate that it has standing to protest a contract award, an offeror whose proposal was excluded from a competitive range for technical unacceptability must demonstrate that its proposal was technically acceptable or that the proposals of the contract awardee and other offerors that made up the competitive range were technically unacceptable. Cf. Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1329, 1333-34 (Fed. Cir. 2001) (holding that protester who was excluded from competitive range had standing to challenge responsibility determination regarding awardee, the sole remaining offeror).

Finally, a protester may only posit arguments that demonstrate that, but for the Government's alleged errors, it

would have had a substantial chance at winning the award. See Greenleaf Constr. Co., Inc. v. United States, 67 Fed. Cl. 350, 362 (2005).

Pursuant to the RFP, only those proposals that were determined to be technically acceptable would be included in the tradeoff analysis that would lead to a best value determination and contract award. See AR 139 ¶ 1. Therefore, to be included in the competitive range of proposals eligible for award, a proposal had to be technically acceptable. See id. HSPS's proposal was determined to be technically unacceptable and, therefore, was excluded from the competitive range. AR 818.

In its GAO protest, HSPS argued that its proposal was technically acceptable. See AR 34, 36. In this action, HSPS does not allege, much less demonstrate, that its proposal was technically acceptable. Nor does it allege or demonstrate that, even if its proposal was technically unacceptable, the proposals of SESI, BAE, and HoveCo were also technically unacceptable. Because HSPS fails to allege or demonstrate that its proposal was technically acceptable or that the proposals of SESI, BAE, and HoveCo were technically unacceptable, it fails to demonstrate standing and, therefore, fails to demonstrate that the Court possesses jurisdiction to entertain its claims. Consequently, the Court should dismiss this action for lack of subject matter jurisdiction.

## II. Even If HSPS Possesses Standing, The Court Should Grant Judgment in Favor Of The Government Because HSPS Does Not Meet The Requirements For An Injunction

### A. Standard Of Review

Even if HSPS possesses standing, the Court should grant judgment in favor of the Government because HSPS does not meet the requirements for an injunction. Injunctive relief is awardable only in extremely limited circumstances. C.A.C.I., 719 F.2d at 1581. In deciding whether a permanent injunction should issue, a court considers: (1) whether, as it must, the protester has succeeded on the merits of the case; (2) whether the protester will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief. See PGBA, LLC v. United States, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004).

A bid award may be set aside only if either the procurement official's decision lacked a rational basis or the procurement procedure involved a violation of regulation or procedure. See Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1329 (Fed. Cir. 2004). The protestor must meet that burden by a preponderance of the evidence. Info. Tech. and Applications Corp. v. United States, 51 Fed. Cl. 340, 346 (2001). The standard of review of a bid protest recognizes the possibility

that there exists a zone of acceptable results in a particular case and requires only that the final decision reached by an agency be the result of a process that "consider[s] the relevant factors" and is "within the bounds of reasoned decisionmaking." Banknote Corp. of America, Inc. v. United States, 56 Fed. Cl. 377, 380 (2003) (quoting Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc., 462 U.S. 87, 105 (1983)), aff'd, 365 F.3d 1345 (Fed. Cir. 2004).

The protester must also prove that any errors in the procurement process significantly prejudiced it. See Bannum, Inc. v. United States, 404 F.3d 1346, 1353 (Fed. Cir. 2005). Furthermore, technical rating decisions are the minutiae of the procurement process that involve discretionary determinations of procurement officials that a court will not second guess. See E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996).

Where the bid protest at issue involves a "negotiated procurement," the protestor's burden of proving that the award was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law is greater than in other types of bid protests. Galen Medical, 369 F.3d at 1330. The higher burden exists because the contracting officer engages in what is inherently a judgmental process. Id. The greater the discretion granted to a contracting officer, the more difficult it will be

to prove the decision was arbitrary and capricious. Id. In a negotiated procurement the contracting officer is entrusted with a relatively high degree of discretion. Id. Thus, a protestor's burden is particularly great in negotiated procurements. ManTech Telecomms. and Info. Sys. Corp. v. United States, 49 Fed. Cl. 57, 64 (2001), aff'd, 30 Fed. App'x 995 (Fed. Cir. 2002) (unpublished table decision).

A negotiated procurement is one in which exchanges between the Government and offerors are undertaken with the intent of allowing the offeror to revise its proposal. See Griffy's Landscape Maint. LLC v. United States, 46 Fed. Cl. 257, 259 (2000) (citing FAR § 15.306(d)). This is a negotiated procurement: the RFP provides that, if necessary, the Government would conduct discussions pursuant to FAR 15.306. AR 139 ¶ 1. Indeed, the Government conducted discussions, inviting revisions to and clarifications of offerors' proposals. AR 412, 977. Because this is a negotiated procurement, the burden upon Hamilton Sundstrand in challenging its exclusion from the competitive range is particularly great.

B. HSPS Does Not Succeed On The Merits Because The Government Reasonably Excluded It From The Competitive Range

HSPS does not succeed on the merits because the Government reasonably excluded it from the competitive range. The RFP provides that only technically acceptable proposals would advance

to a tradeoff analysis to determine an award (AR 139 ¶ 1), and the Government reasonably determined that HSPS's technical proposal was unacceptable. The RFP provides that an acceptable technical proposal includes a flow diagram of the proposed mobility system. AR 140. HSPS did not submit any diagram of its proposed mobility system. See AR 328. Because HSPS did not submit a diagram of its proposed mobility system, HSPS's technical proposal was not acceptable, and the Government reasonably excluded it from the competitive range.

In addition, because HSPS's proposal did not provide the detailed information provided by those of SESI, BAE, and HoveCo, the Government did not treat HSPS unequally by excluding it from the competitive range but not SESI, BAE, and HoveCo. The Government must treat all offerors equally: it must evaluate offers evenhandedly against common requirements and evaluation criteria. Seattle Sec. Servs., Inc. v. United States, 45 Fed. Cl. 560, 569 (2000). (HSPS argues that the Government violated FAR § 15.306(e)(1) (Memorandum Of Points And Authorities In Support Of Motion For Preliminary Injunction ("Pl. Memo.") at 21), but that regulation applies to the Government's conduct of discussions after receipt of proposals. See KSEND v. United States, 69 Fed. Cl. 103, 122 (2005), aff'd, 184 Fed. App'x 956 (Fed. Cir. 2006) (unpublished table decision). In order to demonstrate unequal treatment, a protester must demonstrate that

the Government treated it differently than it treated similarly-situated offerors. See Ryan Co. v. United States, 43 Fed. Cl. 646, 658 (1999). However, inclusion in or exclusion from a competitive range is based upon an evaluation of an overall proposal. NCLN20, Inc., 2001 WL 930722, B-287,692, 2001 CPD ¶ 136, p.5 n.4 (Comp. Gen. 2001). Therefore, the fact that other offerors' proposals might have included individual deficiencies similar to a protester's, but were not excluded from the competitive range, does not, alone, constitute unequal treatment. See id.

HSPS, however, does not demonstrate that, with respect to the issues that it raises, the Government treated it differently than it treated similarly-situated offerors. The RFP required that, to be acceptable, a technical proposal provide a high level of detail: the RFP required (1) "a sound, compliant approach that meets all the requirements of [the PD] and also demonstrates a thorough knowledge and understanding of those requirements and their associated risks (AR 139 ¶ 2); (2) the demonstration of " a sound and feasible methodology of how the proposed configuration complies with the requirements of paragraph 3.3 and 3.4 and all the subsections of these sections of [the PD]" (id.);" (3) "an acceptable narrative description of the chassis design and elevation layouts with major components identified" (id.); (4) a demonstration "in acceptable and detailed methodology how the

proposed configuration complies with the requirements of paragraph 3.6.1, 3.6.9, and 3.7.11 of [the PD] (id.);" and (5) regarding the mobility system, a demonstration "how the proposed configuration complies with the requirements of paragraphs 3.5, 3.6.14, [and] 3.6.15 . . . of [the PD], and such demonstration includes an acceptable flow diagram with controls and significant components identified, and a comprehensive and accurate description of operational and safety controls." AR 140. With respect to the issues that HSPS raises, the Government reasonably determined that HSPS's proposal did not meet those standards, and that the proposals of SESI, BAE, and HoveCo did.

First, HSPS effectively admits that it did not comply with the requirement (AR 140) that, to be technically acceptable, its proposal must have included a flow diagram of the controls and significant components of the mobility system. AR 140. Indeed, HSPS provided no diagram of any type that identified components of the mobility system, even after the Government reminded HSPS of that requirement. AR 328. The proposals of BAE, SESI, and HoveCo, by contrast, all included diagrams that indicated, to one extent or another, controls and significant components of the mobility system, such as the brake handles, wheels, tow bars, connecting cables, tie down points, and lifting rings. AR 779, 784, 1075, 1276, 1307. HSPS's proposal, therefore, is not

similar to the proposals of BAE, SESI, and HoveCo regarding that requirement.

Second, HSPS argues that the information that it provided regarding specific enclosure, air flow, and mobility requirements was similar to that provided by SESI, HoveCo, and BAE (Pl. Memo. at 12-19), and that, in particular, its explanation of how its LASS would be based upon other units was similar to how SESI explained that its LASS would be based upon the [redacted] Pl. Memo. at 10-21. However, the examples that HSPS points to (Pl. Memo. Table 1) are dissimilar.

Regarding PD ¶ 3.3.2's requirement that "[u]sers shall have access to make maintenance adjustments to components on control panel" (AR 146), HSPS effectively admits that its proposal, which describes [redacted] (AR 490), does not meet that requirement. Pl. Memo. at 18. HSPS, however, argues that BAE's proposal provided similar information regarding this requirement. Id. BAE, however, did not describe its panel as [redacted], and explained that its control panel has [redacted]. AR 1046 ¶ 2.3.4. The two proposals, therefore, are not similar regarding that requirement.

Regarding PD ¶ 3.6.9's requirement that the air hose have a quick disconnect and a lanyard chain (AR 149), HSPS admits that it did not explain that its hose had those features, but argues that HoveCo's proposal was similar to its proposal in this

respect. Pl. Memo. at 13-14. HoveCo, however, explained that its LASS air hose "[redacted]" (AR 1293), and, elsewhere in its proposal, explained that "[redacted]" AR 1284. Where HSPS provided no description regarding a quick disconnect and lanyard chain at all, HoveCo provided sufficient information for the Government to determine how HoveCo's proposal complied with PD ¶ 3.6.9. HSPS points to its reference to [redacted] (Pl. Memo. at 13), but that reference (AR 495) does not, as the RFP requires (AR 139 ¶ 2) "demonstrate[] in . . . detailed methodology how the proposed configuration complies with the requirements of" PD ¶ 3.6.9. The two proposals, therefore, are not similar regarding that requirement.

Regarding specific mobility requirements of PD ¶ 3.5, 3.6.14, and 3.6.15, HSPS argues that it provided information, including the word "COMPLY" and reference to other units, similar to that provided by SESI and HoveCo regarding those requirements. Pl. Memo. at 12-19. However, the RFP required that the standard for the mobility factor "is met when the offeror demonstrates <u>how</u> the proposed configuration" complies with paragraphs 3.5, 3.6.14, and 3.6.15 of the PD, "and such demonstration includes . . . a comprehensive and accurate description of operational and safety

controls." AR 140 (emphasis added). SESI's reference to the [redacted] was only the beginning of its description of its LASS; for HSPS, reference to other units not referenced in the RFP was, in some respects, its only description of its LASS. Even then, that description failed to provide sufficient information of actual compliance of the design with PD requirements.

Specifically, HSPS points to the proposals of SESI and HoveCo regarding the requirements for brakes, towing speed, turning radius, tie downs, wheels, and air shipment and towing configuration times. Pl. Memo. at 12-19. SESI addressed those requirements by explaining [redacted]

[redacted] (id.).

Similarly, HoveCo addressed those requirements by explaining [redacted] (AR 1211). (HSPS argues that HoveCo failed to respond to a Government request for information regarding its mobility system (Pl. Memo. at 12-19), but that request was not

for information regarding how HoveCo's LASS would comply with the PD, but [redacted]. AR 1224.)

By contrast, HSPS addressed those requirements only cursorily, incompletely, or by referring to other units instead of describing in detail the characteristics of its proposed LASS. Specifically, HSPS stated (1) "COMPLY" (AR 500, 502); (2) "[redacted]" (AR 500).

In addition, SESI and HSPS relied upon reference to other units very differently. SESI referred to the [redacted] as a way to introduce its LASS, rather than describe it. After explaining that its "baseline system" was the [redacted], SESI described in detail how its improvements upon that system would comply with the PD. AR 758-59, 762-86. HSPS, by contrast, relied upon

reference to other units to describe its LASS's compliance, or possible compliance, with PD requirements. AR 328, 372. Moreover, HSPS was equivocal upon the extent to which its LASS would be based upon the MSU-200NAV: it stated only that [redacted]" (AR 372 (emphasis added), and conceded that "[redacted]" AR 328 (emphasis added). With respect to the reference to RAAF units, HSPS failed to specify, beyond the term [redacted]. AR 372. In these respects, therefore, HSPS's proposal was not similar to those of SESI and HoveCo.

Third, HSPS argues that its explanation of [redacted] was similar to [redacted], and how HoveCo explained its proposal [redacted]. Pl. Memo. at 8-9, 14-15. It also argues that the information that it provided regarding whether [redacted] was similar to that provided by HoveCo and SESI. Pl. Memo. at 14-15.

However, SESI explained how it would comply with [redacted]" AR 780. Moreover, SESI explained how it would meet [redacted] by describing a process that did not require Government input: it explained that it would conduct, in effect, a [redacted]. AR 675.

HSPS, on the other hand, proposed to identify [redacted], only after award and subsequent Government participation in the design process. AR 323, 325, 327. And the HoveCo comments that HSPS refers to upon this and other issues (Pl. Memo. at 9, 13-19) concern not whether HoveCo sufficiently described how its LASS design would comply with the PD requirements, but how the risk of that design, which [redacted], would be mitigated. AR 1224. In these respects, too, therefore, the proposals of SESI and HoveCo were not similar to that of HSPS; unlike HSPS's proposal, the proposals of SESI and HoveCo provided sufficient information from which the Government could

determine that, as the RFP provides (AR 139 ¶ 2), the proposals demonstrated a thorough knowledge and understanding of the requirements of the PD and their associated risks.

Even if one or more of the issues discussed above possibly reflected some unequal treatment, which they do not, HSPS does not demonstrate that, overall, its proposal was similar to those of SESI, BAE, and HoveCo. In contrast to the detailed technical proposals submitted by SESI, BAE, and HoveCo, HSPS proposed what was still an inchoate LASS design. Indeed, HSPS acknowledged the incipient nature of its design when it twice informed the Government that "[redacted]." AR 323, 328. Those candid statements illustrate how much less detail HSPS possessed (much less provided to the Government) regarding its proposed LASS compared to SESI, BAE, and HoveCo, refuting HSPS's claims of unequal treatment.

C. Even If The Government Treated HSPS Unequally In Some Respects, HSPS Does Not Succeed On The Merits Because <u>It Does Not Establish That It Has Suffered Prejudice</u>

Even if the Government treated HSPS unequally in some respects, which it did not, HSPS does not succeed on the merits because it does not establish prejudice. A protester must establish "significant prejudice;" that is, the protester must

show that there was a substantial chance that it would have received the contract award but for the errors it alleges. Bannum, 404 F.3d at 1353.

HSPS does not demonstrate prejudice. HSPS's proposal was determined to be technically unacceptable (AR 818) and, therefore, was excluded from the competitive range of proposals eligible for the tradeoff analysis that would lead to a contract award (AR 139 ¶ 1). HSPS, however, does not demonstrate (or even argue) that its proposal was technically acceptable, such that it should have been included in the competitive range, or that the proposals of SESI, BAE, and HoveCo were technically unacceptable, such that the Government could not have validly awarded the contract to any of those offerors and, therefore, would have had to engage in further discussions that would have kept HSPS in the competition.

Indeed, HSPS does not even address the Government's determination (AR 300, 1332) that HSPS's proposal was technically unacceptable because it failed to provide [redacted]. Because HSPS fails to demonstrate that its proposal was technically acceptable or that the proposals of SESI, BAE, and HoveCo were

technically unacceptable, it fails to demonstrate that, but for the errors that it alleges, it had a substantial chance of receiving the contract award. Therefore, HSPS fails to demonstrate prejudice.

D. Because This Is A National Security Procurement That HSPS Has Waited Months To Challenge In This Court, The Balance Of Hardships And The Public Interest Favor Denial Of Injunctive Relief

Because this is a national security procurement and because HSPS waited months to commence its protest in this Court, the Government's decision to exclude it from the competitive range, the balance of hardships and the public interest favors denial of injunctive relief. In considering whether the balance of the hardships tips in the favor of a protester in a post-award bid protest, the Court must balance the potential harm to the protester of not granting the injunction against the potential harm to both the Government and the awardee should the injunction be granted. Gentex Corp. v. United States, 58 Fed. Cl. 634, 654 (2003). Any harm to the protester and the systemic, long-term interest which the public has in the integrity of the procurement process must be weighed against potential damage to the public interest from other causes. Id.

The Court must consider the interest of national defense in its bid protest decisions. Id. at 655; see 28 U.S.C. § 1491(b)(3). The importance of military preparedness to the national defense can tip the balance of harms in favor of the

Government. Cincom Sys. v. United States, 37 Fed. Cl. 266, 269 (1997). Indeed, the public interest militates against awarding injunctive relief when national defense and national security interests are concerned. Id. The Court should err on the side of caution when such vital interests are at stake. See Gentex Corp., 58 Fed. Cl. 654.

This procurement concerns national defense and national security interests: the LASS will be used to start a variety of Air Force aircraft. AR 194 ¶ 1.1. The Government awarded the contract on August 28, 2006 (AR 1462), but HSPS was informed of its exclusion from the competitive range more than a month earlier, on July 11, 2006. AR 298. HSPS filed a protest with the Air Force on July 20, 2006 (AR 839), which was denied on August 25, 2006. AR 837. Rather than seek relief in this Court, HSPS then sought relief before the GAO, on September 1, 2006. AR 30. Although the protest triggered an automatic stay upon performance of the contract, see 31 U.S.C. §§ 3553(d)(3)(A), (B), the GAO denied the protest on December 8, 2006. AR 1602, 1611. HSPS did not commence its action in this Court until December 22, 2006.

Any further delay to this procurement would have an adverse effect upon military preparedness. The procurement is designed to replace the Air Force's inventory of aircraft starting systems, including for the Air Force's fleet of C-5, C-17, C-130,

KC-135, and B-52 military aircraft. Declaration of John A. Medlin, Colonel, USAF (electronically attached) ¶ 6. LASS units are used primarily as an external startup engine, but also assist in the maintenance, repair, and testing of aircraft and aircraft systems. Id. ¶ 4. Because of the age of the oldest of the current inventory of 1,078 start units, the Air Force has identified a current need for 105 LASS units. Id. ¶ 6. Although the current schedule does not provide for delivery of production units until May 2011, by that time, existing units will have already exceeded their life expectancy. Id. ¶ 7.

Any injunction will adversely effect military preparedness by delaying the introduction of those 105 units, as well as delaying replacement of currently-used units that will reach the end of their 15-year life expectancy by May 2011. Id. ¶¶ 8-9. The Air Force expects that even if it is only required to set aside its July 10, 2006 determination excluding HSPS from the competitive range, that delay will amount to at least three months; if, however, it is required to resolicit new proposals, as HSPS requests in the alternative (Complaint at 13-14), an approximately eight-month delay to the procurement will be the result. Id. ¶¶ 8-9. Consequently, the potential delay to the procurement from an injunction could be three to eight months, in addition to the months of delay already caused by HSPS seeking relief from the GAO instead of this Court. That delay will

require the Air Force to devote even more resources to maintaining and repairing existing LASS units than would otherwise occur, which will reduce even further the number of LASS units available to support maintenance and repair of airframes. See id. ¶ 10.

In addition, pursuant to the contract awarded to SESI in August 2006, the Air Force on December 27, 2006, issued a task order for two "pre-production" units, for delivery in June 2008. AR 1613, 1615-16. Any injunction would almost certainly require the termination of the contract and that task order, resulting in the Government incurring termination costs for work already performed, and inflicting hardship upon SESI resulting from the loss of the contract. For all these reasons, the balance of hardships and the public interest weigh against an injunction.

## CONCLUSION

For the foregoing reasons, the Court should either dismiss this action for lack of subject matter jurisdiction, or deny HSPS's motion for judgment upon the administrative record and grant judgment upon the administrative record in favor of the United States.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/Mark A. Melnick
MARK A. MELNICK
Assistant Director

s/Timothy P. McIlmail
TIMOTHY P. MCILMAIL
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
Telephone: (202) 616-0342
Facsimile: (202) 514-7965

OF COUNSEL:
MAJOR JOHN G. TERRA
Trial Attorney
United States Air Force
AFLOA/JACQ
Arlington, VA

January 17, 2007

Attorneys for Defendant

Certificate of Filing

I hereby certify that on January 17, 2007, a copy of the foregoing Defendant's Motion To Dismiss For Lack Of Jurisdiction, Cross-Motion For Judgment Upon The Administrative Record, And Opposition To Plaintiff's Motion For Judgment Upon The Administrative Record was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Timothy P. McIlmail

Certificate of Filing

I hereby certify that on January 23, 2007, a copy of the foregoing Defendant's Motion To Dismiss For Lack Of Jurisdiction, Cross-Motion For Judgment Upon The Administrative Record, And Opposition To Plaintiff's Motion For Judgment Upon The Administrative Record (Agreed-Upon Redacted Copy - May Be Made Public) was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Timothy P. McIlmail