# In the United States Court of Federal Claims

No. 06-874C
(Reissued: February 21, 2007)[1]

* * * * * * * * * * * * * * * * * * * * * *

HAMILTON SUNDSTRAND POWER
SYSTEMS,

                    *Plaintiff*,

v.

THE UNITED STATES,

                    *Defendant*,

Post-Award Bid Protest;
Standing and Prejudice;
Unequal Evaluation of
Offers

* * * * * * * * * * * * * * * * * * * * * *

    *Frederick W. Claybrook, Jr.,* Washington, DC, for plaintiff, with whom were *Michael D. Newman* and *Brian M. Russ,* Washington, DC, of counsel.

    *Timothy P. McIlmail*, United States Department of Justice, Trial Attorney, Commercial Litigation Branch, Civil Division, Washington, DC, with whom were *Peter D. Keisler*, Assistant Attorney General, *David M. Cohen*, Director, and *Mark A. Melnick*, Assistant Director, for defendant. *Major John G. Terra*, United States Air Force, Arlington, VA, of counsel.

———————

OPINION

———————

BRUGGINK, *Judge*.

    This is a bid protest action for declaratory and injunctive relief brought by plaintiff Hamilton Sundstrand Power Systems ("Hamilton") against the United States, acting through the United States Air Force ("Air Force").

———————

[1] This opinion was first filed on February 6, 2007.  The parties made redactions, reflected here by three consecutive asterisks throughout.

Plaintiff objects to the Air Force's allegedly unequal and unfair evaluation of its technical proposal submitted in response to Request for Proposals ("RFP") No. FA8518-05-R-75369. Plaintiff seeks a declaratory judgment that the Air Force's decision to eliminate plaintiff's proposal from the competitive range was arbitrary, capricious, an abuse of discretion, or otherwise contrary to law. Plaintiff further requests that we set aside the award of Contract No. FA8533-06-D-0007 to Science & Engineering Services, Inc. ("SESI")[2] and reinstate plaintiff in the competitive range.

At a preliminary hearing on December 29, 2006, and by separate order, we denied plaintiff's motion for a preliminary injunction to enjoin SESI's continued performance of the contract. Plaintiff's motion was instead converted into a request for a permanent injunction and a motion for judgment on the administrative record pursuant to Rule 52.1 of the Rules of the Court of Federal Claims. In its cross-motion and opposition, defendant moved, *inter alia*, to dismiss for lack of jurisdiction. The Administrative Record ("AR") has been filed and the matter is fully briefed. Oral argument on the parties' motions was heard on February 2, 2007. For the reasons set out below, we deny defendant's motion to dismiss, deny plaintiff's motion for judgment on the administrative record and request for a permanent injunction, and grant defendant's cross-motion for judgment.

## BACKGROUND

On October 14, 2005, the Air Force issued RFP No. FA8518-05-R-75369 for a requirements-type contract to design, test, and deliver a quantity of Large Aircraft Start Systems ("LASS"). The LASS is a four-wheeled, towable cart that provides compressed air to start a variety of large aircraft engines, including the C-5, C-17, C-130, KC-135, and B-52 military aircraft. The cart consists of an enclosure assembly, fuel system, electrical system, lubrication system, frame, running gear, and air delivery system. The specifications of the LASS cart were set forth in Purchase Description PD04WRLEEG21, which was incorporated into the solicitation.

The RFP required the successful offeror to produce two "first production units" and deliver one to the Air Force for government testing and

---

[2]SESI was notified of the pendency of this action, but has not sought to participate.

keep the other at the contractor's facility for its own testing.  The first production unit was to be delivered to the Air Force within 540 days of the issuance of the first delivery order.  After acceptance, the Air Force would place orders against the contract for production units.

The RFP called for a three-volume proposal consisting of (1) a completed and signed RFP, (2) a technical proposal, and (3) past and present performance information.  The RFP established a best value award basis, utilizing the Technically Acceptable - Risk/Performance/Price Tradeoff ("TA-RPPT") source selection procedure.  Under the TA-RPPT procedure, the Air Force would separately determine the technical acceptability of each technical proposal (*i.e.*, volume II) by evaluating it to "determine if the offeror provides a sound, compliant approach that meets all the requirements of PD04WRLEEG21 and also demonstrates a thorough knowledge and understanding of those requirements and their associated risks."  AR at 139.

Technical acceptability was based on the evaluation of the three components of the technical proposal: (a) enclosure design, (b) air flow and system design/operation, and (c) mobility.  The RFP included evaluation instructions for each of the three components and a corresponding evaluation standard.  Once a proposal was found to be technically acceptable, the evaluation turned to tradeoffs among proposal risks, past and present performance, and price.  Risks and performance were "significantly more important than price." *Id*.

On December 14, 2005, Hamilton became one of five offerors to submit a proposal.  The other four offerors were BAE Systems, HoveCo, SESI, and Trilectron.  On February 17, 2006, the Air Force opened discussions with these five offerors.  The discussions came in the form of evaluation notices, in which the Air Force provided comments and requests for additional information based on its initial evaluation of the proposals.  Hamilton provided written responses to the first set of evaluation notices on March 3, 2006.  Shortly thereafter, on April 17, 2006, the Air Force sent a second set of evaluation notices to Hamilton.  Hamilton again provided written responses on April 28, 2006.

On July 10, 2006, the Air Force made its competitive range determination, eliminating Hamilton and Trilectron because both proposals were found to be technically unacceptable. The next day, the Air Force notified Hamilton in writing that its proposal had been eliminated from the competitive

range.  The notice letter documented the various deficiencies in Hamilton's proposal and responses to the evaluation notices, and explained why the Air Force found the proposal technically unacceptable with respect to each of the three evaluation parts.

In response, Hamilton filed an informal protest directly with the Air Force on July 20, 2006, objecting to its elimination from the competitive range based on what Hamilton characterized as minor or trivial informational "deficiencies" identified in the Air Force's notice letter.  The Air Force denied the protest on August 25, 2006.  Three days later, on August 28, 2006, the Air Force awarded the contract to SESI.  Hamilton then filed a formal protest at the Government Accountability Office ("GAO") on September 1, 2006, raising the same or similar protest grounds.  After receiving the Agency Report on October 5, 2006, which included the technical proposals of SESI, HoveCo, and BAE Systems, Hamilton discovered what it believed to be numerous instances in which its proposal was treated unequally in relation to the proposals of the other offerors.  Hamilton raised this new protest ground in its Comments on the Agency Report.[3]   On December 8, 2006, GAO denied the protest on all grounds.  *See Hamilton Sundstrand Power Sys.*, B-298757, Dec. 8, 2006, 2006 WL 3718184 (Comp. Gen.).

On December 22, 2006, Hamilton brought its protest to this court, again challenging its elimination from the competitive range.  Hamilton, however, has not renewed its earlier protest ground — that its proposal was improperly downgraded for minor informational deficiencies.  Instead, it contends solely that its proposal was treated unequally vis-á-vis the other proposals in the competitive range.  The Air Force issued its first task order under the contract to SESI on December 27, 2006.

---

[3]It appears that GAO incorporated this new protest ground into the original protest, rather than treat it as a supplemental protest, because the Air Force did not file a Supplemental Agency Report, and the unequal treatment ground was not assigned a supplemental docket number.

DISCUSSION

I.      Jurisdiction and Standard of Review

We have jurisdiction pursuant to the Tucker Act, 28 U.S.C. § 1491(b)(1) (2000), as amended by the Administrative Dispute Resolution Act of 1996, Pub. L. No. 104-320, § 12, 110 Stat. 3870, 3874-75 (1996) ("ADRA"),[4] to consider an action by an interested party objecting to an award of a contract and any alleged violation of a statute or regulation in connection with a procurement. We may provide declaratory and injunctive relief as we deem proper. 28 U.S.C. § 1491(b)(2).

We are directed by section 1491(b)(4) to review the legality of an agency's decision based on the standards set forth in the Administrative Procedure Act ("APA"), 5 U.S.C. § 706 (2000), which provides that the reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

The Federal Circuit has interpreted the APA standard in the bid protest context to mean that an agency's action may be set aside under two circumstances: "(1) [when] the procurement official's decision lacked a rational basis; or (2) [when] the procurement procedure involved a violation of regulation or procedure." *Banknote Corp. of America v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004) (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)). *See also Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005) (The reviewing court must determine "whether the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract." ). The rational basis test involves a determination of "whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a 'heavy burden' of showing that the award decision had no rational basis." *Banknote Corp.*, 365 F.3d at 1351 (quoting *Impresa*, 238 F.3d at 1332) (internal citation omitted). Even if the agency's action violated a procurement statute or procedure, the disappointed bidder still must "show a clear and prejudicial violation of

---

[4]The ADRA repealed section 1491(a)(3) of the Tucker Act and replaced it with an amended, and current, section 1491(b).

applicable statutes or regulations." *Id.* (quoting *Impresa*, 238 F.3d at 1333). In reviewing the agency's evaluation of proposals, our review is generally limited to the administrative record. *See Gentex Corp. v. United States*, 58 Fed. Cl. 634, 648 (2003). Our consideration of the agency's action is deferential. *See Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057-58 (Fed. Cir. 2000).

II.     Standing

The Air Force argues that this action should be dismissed because Hamilton does not have standing. The Air Force's argument is premised on the theory that even if all of the alleged instances of unequal treatment are remedied, Hamilton's proposal would still be unacceptable because of other deficiencies in Hamilton's proposal. The Air Force thus believes that Hamilton did not have a substantial chance of receiving the award, which would deprive it of standing. The Air Force's argument here is misplaced.

Standing is a "threshold requirement in every federal action." *Sicom Sys. Ltd. v. Agilent Techs., Inc.*, 427 F.3d 971, 975-76 (Fed. Cir. 2005). Pursuant to the ADRA, only an interested party has standing to bring a bid protest action. The Federal Circuit has held that Congress intended an "interested party" under the ADRA — undefined in 28 U.S.C. § 1491(b) — to be the same "interested party" defined in the Competition in Contracting Act as "an actual . . . offeror whose direct economic interest would be affected by the award of the contract . . . ." 31 U.S.C. § 3551(2)(A). *See American Fed'n of Gov't Employees, AFL-CIO v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001). Therefore, Hamilton must show that it was an interested party to establish standing.

Hamilton is clearly an "interested party" in the sense that it was an actual offeror who would no doubt benefit from receiving the award. But the Federal Circuit has also made clear that "prejudice (or injury) is a necessary element of standing." *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1370 (Fed. Cir. 2002). To satisfy the prejudice requirement, Hamilton must show that it had a substantial chance of being awarded the contract but for the alleged violation of the procurement statute or regulation. In other words, Hamilton's "chance of securing the award must not have been insubstantial." *Info. Tech. & Applications Corp. v. United States,* 316 F.3d 1312, 1319 (Fed. Cir. 2003).

Hamilton argues that the award to SESI should be set aside because of significant errors in the procurement process. Hamilton alleges several instances in which its proposal was treated unequally in relation to the other proposals that were part of the competitive range. It insists that the evaluation standards were not applied evenhandedly to Hamilton's proposal, requiring, among other things, more detail from its proposal for it to be technically acceptable. Hamilton believes that if the Air Force evaluated its proposal equally, it would have been technically acceptable and thus included in the competitive range.

The standing inquiry is made at the threshold of the merits inquiry. We consider Hamilton's plausible allegations and merely ask whether, if they turn out to be correct, Hamilton had more than an insubstantial chance of receiving the award. Under the Air Force's approach, we would resolve the merits of its defenses prior to deciding whether Hamilton had standing. Given the nature of this particular evaluation process — namely, there was a single, unified, un-scored determination of acceptability — we believe it is sufficient to trigger court review for Hamilton to *allege* that there were substantial[5] instances of unequal treatment. If, after considering the merits of these claims, we conclude that there were no instances of unequal treatment, or, that there were other, independent, reasons for treating Hamilton's proposal as unacceptable, Hamilton would lose on the merits. The court would not thereby be ousted of jurisdiction. Given the substantiality of the allegations and in light of the single, un-scored acceptability determination, we conclude that sufficient standing is shown to proceed with the merits.

We also note that Hamilton's price was approximately *** than the awardee's final price, even after the awardee was provided an opportunity to submit final proposal revisions. Clearly, under these circumstances, Hamilton had "greater than an insubstantial chance of securing the contract if successful on the merits of the bid protest." *Id.* Hamilton has established potential prejudice and, therefore, standing. We deny defendant's motion to dismiss.

---

[5]Hamilton conceded during oral argument that the court could exercise its jurisdiction in determining some unequal treatment to be trivial.

III.    Unequal Treatment of Offers

While we are mindful that this court must "accord an agency's technical evaluation great deference," *Textron, Inc. v. United States*, 74 Fed. Cl. 11, 32 (2006), the Federal Acquisition Regulations[6] impose certain responsibilities on the contracting officer in the performance of her duties that we cannot ignore.  One of those duties is to "[e]nsure that contractors receive impartial, fair, and equitable treatment" throughout the procurement process.  48 C.F.R. § 1.602-2(b).  Moreover, we have previously held that, even though bid protest jurisdiction in this court is no longer premised on a theory of an implied-in-fact contract, it is "still recognized that the issuance of a competitive solicitation which generates responsive offers gives rise to an implied contract of fair dealing." *Hunt Bldg. Co. v. United States*, 61 Fed. Cl. 243, 273 (2004).  The Air Force, and the contracting officer in particular, thus have both an express and implied obligation to treat all offerors equitably.  This obligation necessarily extends to the equal and impartial evaluation of all proposals, for it is well established, at this court and at GAO, that a "contracting agency must treat all offerors equally, evaluating proposals evenhandedly against common requirements and evaluation criteria." *Banknote Corp. of America v. United States*, 56 Fed. Cl. 377, 384 (2003), *aff'd* 365 F.3d. 1345 (Fed. Cir. 2004).  *See also Seattle Sec. Servs., Inc. v. United States*, 45 Fed. Cl. 560, 569 (2000); *Incident Catering Servs., LLC*, B-296435.2, Sept. 7, 2005, 2005 CPD ¶ 193 at 4;  *U.S. Prop. Mgmt. Serv. Corp.*, B-278727, March 6, 1998, 98-1 CPD ¶ 88 at 4.

Hamilton argues that its proposal did not receive impartial, fair, or equitable treatment, and consequently, its technical unacceptability rating and resulting elimination from the competitive range were arbitrary and capricious.  We agree with Hamilton that the unequal treatment complained of, if established and material, would be a "quintessential example[] of conduct which lacks a rational basis." *Hunt Bldg.*, 61 Fed. Cl. at 273.  The sole question, therefore, is whether, as Hamilton insists, the record reflects that the Air Force unreasonably downgraded Hamilton's technical proposal for deficiencies that are substantively indistinguishable from those found in the proposals of the other offerors who remained in the competitive range.  For the reasons set out below, we conclude it does not.

---

[6]Title 48 of the Code of Federal Regulations.

A.       RFP Requirements

As a preliminary matter, the RFP instructed all offerors to submit technical proposals that included three basic parts.  Each part corresponded to various sections of the Purchase Description.  The instructions stated:

Part (a): Enclosure Design

The proposal shall include a detailed narrative description of the chassis design and shall identify the position and elevation and have a layout of all major system components, including the engine, the compressor, the battery recharge device, and the battery.  The narrative shall explain how the system complies with section 3.3 and 3.4 and any of the subsections contained within those sections of PD04WRLEEG21.  A legend and a description of all components shall be included.

Part (b): Air Flow System Design/Operation

The proposal shall include a detailed narrative description of the air flow system including the components and the control of flow and pressure through the full range of adjustment. It also shall include a flow diagram with the significant components identified and give a description of the operation and safety controls and how the air flow system design/operation complies with the requirements of paragraphs 3.6.1, 3.6.9, and 3.7.11 of PD04WRLEEG21.

Part (c): Mobility

The proposal shall include a detailed narrative description of how the proposal configuration complies with the requirements of paragraphs 3.5, 3.6.14, 3.6.15, and 3.13 of PD04WRLEEG21. The proposal shall include a flow diagram with controls and significant components identified, and a description of operational safety controls.

AR at 136-37.  The evaluation of technical capability was based on an analysis of the three parts in the technical proposals.

9

There were corresponding evaluation standards for each of these three parts:

> Part (a): Enclosure Design
>
> The standard for this part of Subfactor 1 is met when the offeror demonstrates a sound and feasible methodology of how the proposed configuration complies with the requirements of paragraph 3.3 and section 3.4 and all of the subsections of these sections of PD04WRLEEG21, and the configuration demonstration includes an acceptable narrative description of the chassis design and elevation layouts with major components identified.
>
> Part (b): Air Flow System Design/Operation
>
> The standard of those Part (b) of Subfactor 1 is met when the offeror demonstrates an acceptable and detailed methodology how the proposed configuration complies with the requirements of paragraphs 3.6.1, 3.6.9, and 3.7.11 of PD04WRLEEG21. A technically acceptable proposal for Part (b) includes an acceptable flow diagram, with the significant components identified, and a comprehensive and accurate description of operations and safety controls.
>
> Part (c): Mobility
>
> The standard of Part (c) of Subfactor 1 is met when the offeror demonstrates how the proposed configuration complies with the requirements of paragraphs 3.5, 3.6.14, 3.6.15, and 3.13 of PD04WRLEEG21, and such demonstrations include an acceptable flow diagram with controls and significant components identified, and a comprehensive and accurate description of operational and safety controls.

*Id*. at 139-40. It becomes immediately apparent from these instructions and evaluation standards that the Air Force expected a certain level of detail and explanation in the technical proposals. Of particular importance, the Air Force specifically requested information that would demonstrate how the proposed

LASS carts would comply with the Purchase Description requirements.

Proposals were found either technically acceptable or not.  There was neither an overall score nor a separate score within each of the three parts of the proposal.

B.    Level of Detail Required to Demonstrate Technical Acceptability

Hamilton first argues that the Air Force unfairly downgraded its proposal for not having a sufficient level of detail to comply with RFP requirements, while not downgrading the proposals of SESI, HoveCo, and BAE Systems for a similar lack of detail.  We will address each of Hamilton's alleged instances of unequal treatment under Parts (a), (b), and (c).

1.    Part (a) — Enclosure Design

The only instance of "level of detail" unequal treatment Hamilton alleges under Part (a) relates to the control panel.[7]  Section 3.3.2 of the Purchase Description set forth the following requirement for the control panel: "[t]he contractor shall place all operating controls and gauges on one control panel unless authorized by the government.  Users shall have access to make maintenance adjustments to components on control panel."  *Id*. at 146. Hamilton insists that it proposed a *** which Hamilton now argues represents an ***.  Plaintiff's Memorandum of Points and Authorities ("Pl.'s Mem.") at 18.  Hamilton's proposal, however, failed to state ***.  Hamilton's proposal merely stated that ***.  AR at 489 (emphasis added). Hamilton's proposal also reflected, however, that ***.  *Id.*  The Air Force found Part (a) of Hamilton's proposal unacceptable in part because it did not provide "information to include accessibility for maintenance adjustments to components on control panel."  *Id.* at 1332.  Hamilton alleges that BAE Systems' proposal similarly failed to describe the accessibility of its control panel, yet Part (a) of BAE Systems' proposal was found technically acceptable without any mention of its failure to address this section 3.3.2 requirement.

---

[7]Hamilton challenges other aspects of the evaluation of Part (a), discussed later in this decision.

As a preliminary matter, *** not identical. Hamilton's proposal offered no ***, whereas BAE Systems' proposal referenced its panel as ***. *Id.* at 480, 1060. The distinction is noteworthy because Hamilton's explanation for why its proposal failed to address accessibility is that access to the control panel was unnecessary because ***. Yet, Hamilton's *** because a ***, not that maintenance itself was unnecessary. In addition, Hamilton specifically stated that ***, but did not explain how ***. BAE Systems' proposal stated that its control panel was *** without qualifications. Hamilton argues that the Air Force should have concluded that accessibility was ***. But, *** was not what Hamilton proposed. If the Air Force applied the same rationale to BAE Systems' proposal, on the other hand, then that explains why the Air Force did not downgrade BAE Systems' proposal for failing to discuss accessibility — accessibility was unnecessary because its control panel, unlike Hamilton's, was ***.

We recognize, however, that neither Hamilton nor BAE Systems furnished information about the accessibility of their control panels, yet Hamilton's proposal was found unacceptable in part for this deficiency. The Air Force's failure to question BAE Systems was unexplained. We believe, however, that the import of this apparently disparate treatment was de minimis in light of the distinction between the proposals on this issue and the other deficiencies throughout Hamilton's proposal. Hamilton's proposal was found unacceptable under Part (a) for other reasons, including its failure, unlike other offerors, to provide sufficient discussions of the size and weight of its LASS unit and its failure to provide a design plan of the chassis.[8] As we conclude later, this minor example becomes the only example of apparently unequal treatment. This single instance is an insufficient basis to hold that the overall result was arbitrary or capricious.

2.      Part (b) — Air Flow System Design/Operation

The only instance of "level of detail" unequal treatment Hamilton alleges under Part (b) relates to the air delivery hose. Section 3.6.9 of the Purchase Description stated in part that the air delivery hose "shall be the

---

[8]During oral argument, Hamilton alleged, for the first time, unequal treatment with respect to the size and weight and the chassis design issues. Hamilton had two opportunities to raise these issues, but it did not. Therefore, it would be prejudicial to the Air Force to consider these allegations now.

standard bleed air hose 30ft. (100ft. availability) long with quick disconnect and lanyard chain" and shall be "in accordance with MIL-DTL-22706G type III, class I." *Id*. at 149. Offerors were required to provide a narrative description along with a flow diagram that demonstrated how the air flow system complied with the requirements of section 3.6.9.

Based on an initial review, the Air Force found that Hamilton's proposal satisfied other sections of the Purchase Description under Part (b), but concluded that it needed to issue an evaluation notice to verify Hamilton's compliance with section 3.6.9 "before Part (b) can be acceptable . . . ." *Id*. at 1333. Hamilton's original proposal did not mention anything about a quick disconnect and lanyard chain, or the air hose's compliance with the military specification MIL-DTL-22706G, which relates to the hose covering. Hamilton's proposal did not include a narrative description, but instead included the word "COMPLY" in a chart next to "section 3.6.9" *Id*. at 501. In response to the evaluation notice, Hamilton provided slightly more information, explaining that its LASS unit "will comply with the [section] ***. *Id*. at 320. Hamilton's response thus did not describe the disconnect and chain nor the hose's compliance with the required military specification. The Air Force concluded that Hamilton "continued to be unclear" about whether its proposed cart would meet the requirements of section 3.6.9, and accordingly found Part (b) to be unacceptable.[2/] *Id*. at 1334.

Hamilton argues that HoveCo's proposal was similarly lacking in detail with respect to its compliance with section 3.6.9 because HoveCo's proposal did not state that it would use a lanyard chain. While it appears that HoveCo's proposal did not mention a lanyard chain, and the chain did not appear in the

---

[2/]Hamilton argues that its proposal demonstrated compliance with *** by specifying the use of the ***. Plaintiff's Opposition at 16. Hamilton explains that this is *** that complies with the Purchase Description requirement. Hamilton's proposal itself, however, did not describe the essential features of the *** — it merely stated the part number. Instead, Hamilton now cites to the declaration of an expert submitted in support of Hamilton's protest at GAO, wherein the expert described the features of the ***. We do not believe, therefore, that the key features of this *** were self-evident to the Air Force evaluators. The explanation, in short, came too late. The Air Force's conclusion that Hamilton "continued to be unclear" was reasonable.

illustration of its proposed LASS unit, the Air Force did not evaluate the two proposals unequally. HoveCo's proposal provided a narrative description of its air delivery hose, including the relevant information that its hose had  ***  and was in "accordance with MIL-DTL-22706G . . . ."   *Id*. at 1293. Hamilton's proposal lacked this information.

The Air Force found that, as a whole, HoveCo's proposal effectively demonstrated its compliance with section 3.6.9 despite its failure to address the lanyard chain. Hamilton's proposal, however, was found unacceptable for Part (b) for other reasons besides its failure to address the lanyard chain, namely, its failure to adequately address the quick disconnect requirement and its failure to demonstrate compliance with MIL-DTL-22706G. In this regard, we agree with GAO's earlier decision rejecting Hamilton's argument of unequal treatment:

> [The prohibition on unequal treatment] does not mean . . . that an agency may not reasonably exclude a proposal that contains significant informational deficiencies from a competitive range, while retaining in the competitive range proposals with informational deficiencies of less magnitude. In this connection, since inclusion in or exclusion from the competitive range is based on evaluation of the overall proposal and not on a single deficiency, the fact that other offerors' proposals may have deficiencies similar to the protester's, but were not excluded from the competitive range, does not, in and of itself, demonstrate unequal treatment.

*Hamilton Sundstrand Power Sys.*, 2006 WL 3718184 at *10.

3.     Part (c) — Mobility

Hamilton alleges several instances of "level of detail" unequal treatment under Part (c). The first instance relates to section 3.6.14 of the Purchase Description, which set forth the following requirement:

> Wheels shall be of a pneumatic type that will absorb vibration while the LASS are transported. The wheels will need to be able to transport the LASS while it is in operational and transport mode. The LASS shall have a breaking system that

14

shall be hand/foot operated which shall not allow the LASS to move on a slope of 15 degrees.

*Id*. at 150.  Hamilton argues that it "expressly confirmed that it would comply with [the section 3.6.14] specification" and that "substantively identical proposal responses were provided by SESI and HoveCo."  Plaintiff's Complaint ("Pl.'s Compl.") at 7.  Hamilton is incorrect on both counts. Hamilton's only treatment of section 3.6.14 in its proposal appears in a "purchase description compliance" chart that merely stated "COMPLY" next to section 3.6.14.  AR at 502.  The Air Force, finding Hamilton's one-word "demonstration" inadequate, commented in an evaluation notice to Hamilton that it "did not provide a detailed demonstration of how compliance will take place." *Id*. at 372.  Hamilton's only substantive explanation was that the *** and that the "breaking system will be designed to meet the requirements." *Id*.

The Air Force found Hamilton's response insufficient, noting in its Final Technical Evaluation Report that Hamilton "should not just state that unit [sic] will be in compliance, but it shall provide a narrative as to how it will comply with each aspect of the PD . . . ." *Id*. at 1335.  This assessment is well-founded.  The RFP instructed offerors to provide a "detailed narrative description" of *how* the LASS will comply with the Purchase Description, and to "demonstrate[] how the proposed configuration complies" with the specific Purchase Description section. *Id*. at 137.  Hamilton plainly did not meet the requirements of the RFP in this respect.

Hamilton insists, however, that SESI and HoveCo's proposals also merely parroted the specification, and thus provided no greater level of detail than Hamilton's proposal.  We disagree.  There are noticeable differences between Hamilton's proposal and the other proposals.  For example, SESI's proposal provided a narrative description of the LASS wheels, including such ***; a description of the ***; and an illustration of the brake system.  While HoveCo's proposal did not provide as much information, it did include a narrative description of the tires and an illustration reflecting the location of the ***, information that was lacking in Hamilton's proposal.  Although the level of detail in HoveCo's proposal did not match the detail in SESI's proposal, it provided more detail than Hamilton's proposal.

We see no reason to question the Air Force's judgment in concluding that the amount of information in HoveCo's proposal was sufficient, while finding Hamilton's information insufficient.  The Air Force even provided

Hamilton a second chance to correct its initial deficiency.  Instead of providing a "detailed demonstration" from which the Air Force could evaluate Hamilton's compliance with section 3.6.14, Hamilton's response amounted to little more than a promise to comply.

The second instance of alleged unequal treatment under Part (c) relates to the mobility requirements set forth in section 3.5 of the Purchase Description, which provided in part:

> The LASS shall comply with the mobility requirements specified in AS8090 for Type I, Class 2 equipment ground mobility, except that it shall be towable at speeds up to 15 mph, with a 20-foot maximum safe turning radius.  Also, each tie down point will have a minimum clear opening of 1-1/2 inches. The unit shall also be capable of being configured for air shipment in less than 10 minutes.  The user shall be able to reassemble to towing configuration in less than 5 minutes.

AR at 148.  Hamilton argues that this aspect of its proposal was found unacceptable for lack of sufficient information even though SESI and HoveCo's proposals similarly lacked detail or merely parroted back the actual requirements.

In its original proposal, Hamilton relied solely on a chart, inserting the single word "COMPLY" to indicate its intent to comply with section 3.5 mobility requirements, again in lieu of a narrative description.  *Id*. at 500.  The Air Force, consistently finding the one-word "narrative" an inadequate demonstration of how Hamilton's LASS unit would comply with the mobility requirements, requested additional information through evaluation notices. With respect to the towing speed *** responded with the assurance that the ***.  *Id*. at 372.  Hamilton did not represent that it was offering *** of the air start unit, nor did it provide details on that unit's mobility system.

The Air Force then issued a second evaluation notice, reminding Hamilton that its "response should not just state that unit [sic] will be compliant, but it shall provide a narrative as to how it will comply" with the Purchase Description.  *Id*. at 328.  Hamilton's second response again failed to provide the requested narrative.

While Hamilton's proposal did not provide specific information from which the Air Force could evaluate its compliance with section 3.5, SESI and HoveCo's proposals did.  SESI's proposal explained that its new fuel tank would ***, which would allow the unit to be "easily towable at 15 mph."  *Id*. *** The proposal also stated that its unit would have a "turning radius of ***, within the required *** could be towed in ***, and has a turning radius of ***. *Id*. at 1297.  Both SESI and HoveCo's proposals had a greater level of detail than Hamilton's proposal in this regard.  The Air Force, therefore, did not treat the proposals unequally by finding SESI and HoveCo's proposals acceptable.[10]

With respect to the configuration and reassembly times, Hamilton's proposal stated that its unit ***.  *Id*. at 493.  Nevertheless, some time would be required to remove fuel from the unit if that was a prerequisite for air transportation.  The Air Force found this caveat acceptable, but cited configuration time as one of the details missing in Hamilton's proposal, contributing to its unacceptability determination.  SESI's proposal stated that its unit could be configured for air shipment in less than ***.  SESI also explained that the unit could be reconfigured for use by ***.  HoveCo explained to the Air Force that its unit could be configured for air shipment by ***, which could "easily" occur in ten minutes or less.  *Id*. at 1211.  The Air Force found both SESI and HoveCo's proposals technically acceptable for Part (c).

Hamilton believes its proposal provided the same amount of detail as the other two proposals with respect to the configuration times.  Hamilton argues that because it stated that its unit ***, then  configuration for air

---

[10]Hamilton argues that the Air Force requested, but never received, additional information from HoveCo with respect to its mobility system, yet, nevertheless, found HoveCo's proposal acceptable. Hamilton cites evaluation notice EN-T-HC-2, wherein the Air Force requested additional information with respect to HoveCo's proposed ***.  The Air Force noted that HoveCo did not provide information to mitigate the risk.  The Air Force found HoveCo's proposal acceptable despite its failure to mitigate the risk of integration.  We find nothing improper with the Air Force's evaluation because risk of integration was neither an element of technical acceptability nor a requirement of section 3.5 of the Purchase Description.  The Air Force appropriately considered HoveCo's failure to mitigate the risk by assessing it a ***.  *Id*. at 1346.  Therefore, this was not an instance of unequal treatment.

shipment necessarily must be less than ten minutes, with \*\*\*.  While that conclusion might be inferred, Hamilton's proposal did not explain it in specific terms, despite the clear instructions in the RFP and the Air Force's request for additional information.  It was rational, therefore, for the Air Force to find Hamilton's response insufficient, especially when the other two proposals had more detail than Hamilton's proposal on this matter.  We find no reason to conclude that the Air Force treated the proposals unequally.

The third instance of asserted unequal treatment under Part (c) relates to the Purchase Description's requirement for cargo tie downs and hoisting provisions.  Section 3.6.15 stated in relevant part:

> The LASS shall be designed to be air, land, and sea transportable with four cargo tie downs for LASS retention.  Each cargo tie down shall have a minimum operating load capability of twice the weight of the LASS.

*Id.* at 150.  Section 3.5 of the Purchase Description also stated that "each tie down point will have a minimum clear opening of 1-1/2 inches."  *Id.* at 148.

Hamilton argues that it "expressly confirmed that it would comply with the requirements" of section 3.6.15.  Pl.'s Mem. at 15.  Hamilton's express confirmation was, again, the single word "COMPLY" in a chart.  AR at 501.  When asked for additional information, Hamilton provided the following response:

> \*\*\*.  The tie down features will use the same type of hardware and will be re-qualified for the LASS program.

*Id.* at 372.  Hamilton's proposal, and response to the evaluation notice, failed to mention the minimum opening space and the minimum operating load capability, both express requirements of the Purchase Description.  Instead, Hamilton's response made generalized references to LASS units used by \*\*\*.  The Air Force found that the lack of detail relating to this aspect of Hamilton's proposal rendered the proposal technically insufficient.

Hamilton argues that HoveCo's proposal also "parroted the requirement."  Pl.'s Mem. at 15.  We disagree.  HoveCo's proposal stated that the tie downs are \*\*\* and "each ring has a clear opening of \*\*\*."  AR at 1297.  Likewise, Hamilton argues that SESI's proposal only restated the tie down

features of its baseline design.  SESI's proposal, however, provided specific information, including that the tie downs are located in the ***, and that each ring has an opening of ***.  Hamilton's proposal was entirely devoid of specific information from which to evaluate its compliance with section 3.6.15.  The Air Force, thus, did not treat Hamilton's proposal unequally.

The final instance of alleged "level of detail" unequal treatment under Part (c) concerns Hamilton's asserted failure to provide a flow diagram of its proposed mobility system, as required by the RFP.  Hamilton argues here that the RFP's requirement to include a flow diagram was "nonsensical" because a flow diagram "depicts step-to-step progression of a *process*."  Pl.'s Mem. at 20 (emphasis in original). Hamilton explains that it was "confused" by the requirement because one "cannot depict the 'flow' of a physical object such as a mobility system."  *Id*.  Hamilton's proposal was found unacceptable in part because it failed to satisfy the flow diagram requirement.  The proposals of SESI and HoveCo provided detailed illustrations depicting key elements of their mobility systems.  The proposal of BAE Systems provided a diagram "showing location of key components and a preliminary idea for system interaction."  AR at 1325.  These three proposals were found acceptable. Hamilton suggests that the Air Force improperly accepted the illustrations in SESI and HoveCo's proposals because they were not in fact "flow diagrams," and improperly accepted BAE Systems' diagram because it "makes no sense." Pl.'s Mem. at 20.

The Air Force's evaluation of these three proposals was not arbitrary or irrational.  While there are noticeable differences in terms of useful information between the illustrations in SESI and HoveCo's proposals and the diagram in BAE Systems' proposal, the Air Force considered BAE Systems' diagram sufficient to meet the requirements.  As the Air Force explained, BAE Systems' diagram depicts the basic interaction of key mobility components, such as ***.  The Air Force found this diagram acceptable because it provided a "preliminary idea for system interaction."  AR at 1325.

We will not second-guess the Air Force's judgment.  Our task is not to question whether the illustrations or flow diagram in the other three proposals adequately fulfilled the requirements of the RFP.  Rather, we must determine whether the Air Force treated Hamilton's proposal unequally during the evaluation of this aspect of the proposals.  In that regard, we disagree with Hamilton's assertion of unequal treatment.

First, regardless of the level of detail expected by the Air Force, Hamilton's proposal did not include a diagram, illustration, or any other depiction of certain aspects of its mobility system, such as its tow bar and braking system;[11] the proposals of SESI, HoveCo, and BAE Systems did. Thus, even if BAE Systems' flow diagram provided little useful information, it was more than Hamilton provided.

Additionally, the Air Force provided Hamilton two additional opportunities to submit an acceptable flow diagram. In an initial evaluation notice, the Air Force explained that Hamilton "failed to provide a flow diagram identifying controls and significant components of the mobility system as required by the RFP." *Id*. at 372. In response, Hamilton provided a diagram of the engine and air control, but did not address other aspects of the Purchase Description's mobility requirements. Finding Hamilton's response insufficient, the Air Force explained in a second evaluation notice that Hamilton "shall provide a flow diagram of the mobility system to include items such as tires, brakes, axles, tow bar, safety controls, etc." *Id*. at 328. Hamilton responded that it did not understand what was being requested and asked, "[w]hat is a 'flow diagram' of the mobility system?" *Id*. The Air Force found Hamilton's repeated failure to provide a flow diagram unacceptable.

Finally, we do not sympathize with Hamilton's confusion as to the requirements of the RFP. Hamilton is, in essence, objecting to an apparent ambiguity in the terms of the solicitation. If Hamilton did not understand the instructions that offerors "shall provide a flow diagram," it could have sought clarification prior to the proposal due date, rather than ignore the requirement. Even though Hamilton eventually asked the Air Force to explain the requirement for a flow diagram, that request came too late. Hamilton had been provided a total of three opportunities to respond adequately to the requirement: its original proposal, its response to the first evaluation notice, and its response to the second evaluation notice.[12] The Air Force's decision

---

[11]During oral argument, Hamilton insisted that it did provide a comparable illustration of its mobility system. Hamilton cited an illustration of the \*\*\*. *See* AR at 483. We disagree. The illustration Hamilton provided depicts \*\*\*, including \*\*\*. Key elements of the mobility system, however, are not depicted or labeled, such as the \*\*\*.

[12]Our conclusion is further supported by the fact that Hamilton
(continued...)

not to provide Hamilton (and the other offerors) a third round of discussions was not unreasonable in light of its remaining deficiencies in other areas of its proposal.

C.     Baseline Designs

Hamilton also argues that the Air Force unequally evaluated what Hamilton calls the "baseline design" of the proposed LASS unit.   Both Hamilton and SESI based their proposed units on existing models of similar air start carts and then offered various modifications or upgrades.   Hamilton's *** unit, which Hamilton ***.   Hamilton explained that its new LASS unit, the MSU-200LASS, "*** . . . ."   *Id*. at 482.   SESI's proposed unit was based on the ***, which is used by ***.   SESI,  however, did not design or produce the *** unit.

Hamilton's allegation is that the Air Force found SESI's approach to be technically acceptable even though SESI "did not provide any information about how its own LASS system would comply with LASS mobility system requirements."   Pl.'s Mem. at 11.   Hamilton insists that its proposal, on the other hand, was found technically unacceptable in part because the Air Force "took issue with [Hamilton's] citation of the ***  . . . as its design baseline, and included this criticism in its ground for ejecting [Hamilton] from the competitive range."   *Id.*   We disagree with Hamilton's analysis for several reasons.

First, Hamilton does not cite any evaluation documents to support the allegation that the Air Force eliminated Hamilton's proposal from the

---

[12]/(...continued)
provided an illustration of its engine and air control system in response to the first evaluation notice, which specifically asked for a flow diagram of the mobility system.   The Air Force responded that the "*flow diagram* provided by [Hamilton] in response to [the evaluation notice] only addressed the engine and air control."   AR at 328 (emphasis added).   That the Air Force described Hamilton's illustration as a "flow diagram" suggests that Hamilton should have been able to conclude that an illustration was an acceptable flow diagram. The problem with Hamilton's first response was not the illustration provided, but what the illustration failed to depict, namely, specific elements of the mobility system.

competitive range because its design was based on ***.  Instead,  Hamilton cites the Contracting Officer's Statement of Facts and Findings — which is not a contemporaneous evaluation document and was only provided in response to the GAO protest — wherein the contracting officer stated that the "Air Force *** base its determination of technical acceptability upon the success of *** units" and that it would have been "improper for the Air Force to regard *** units as part of its determination of technical acceptability."  AR at 24.

The contracting officer was responding to Hamilton's specific GAO protest allegation that the Air Force disregarded Hamilton's intent to "meet the LASS requirement by adapting ***."  *Id*. at 23.  The essence of the contracting officer's response is that the Air Force should not ***.  *Id*. at 24.  In short, Hamilton's mere reference to a prior design was insufficient, standing alone, to give the Air Force any specific design information.

This example illustrates a recurring flaw in Hamilton's proposal, in that it frequently failed to provide sufficient information from which the Air Force could evaluate its compliance with specific Purchase Description requirements. It is helpful by way of illustration to contrast SESI and Hamilton's proposals with respect to section 3.6.14 of the Purchase Description, which stated that "[w]heels shall be of a pneumatic type that will absorb vibration while the LASS are transported."  *Id*. at 150.  SESI's proposal provided the following narrative description:

***

*Id*. at 372.

Hamilton believed that its stated intent to use *** as a baseline was sufficient to meet the specific LASS requirements in certain circumstances, even though the RFP instructed offerors to provide a detailed narrative description that would demonstrate how the proposed design would meet the specific requirements of the Purchase Description.  In her post hoc explanation, the contracting officer explained why it was improper for Hamilton to assume that the Air Force would evaluate *** in lieu of a narrative description of Hamilton's proposed cart design. It is, therefore, clear that the Air Force did not "take issue" with Hamilton's use of *** as a baseline, but rather was critiquing Hamilton's failure to provide detail.

Second, assuming, argue *** Force did downgrade Hamilton's proposal for using *** as a baseline design, Hamilton improperly characterizes its

22

grievance as an instance of unequal treatment.  On one hand, Hamilton complains that its proposal was downgraded because it used \*\*\* as its baseline design.  On the other hand, Hamilton insists the Air Force found SESI's proposal acceptable, even though, (1) SESI used \*\*\* that is \*\*\* and (2) SESI did not provide "any information about how its own LASS system would comply with LASS mobility system requirements."  Pl.'s Mem. at 11.

On the first issue, it is irrelevant for acceptability purposes whether SESI's proposed baseline design is \*\*\* or not.  The RFP did not require offerors to base their LASS cart design on \*\*\*.  The Air Force did not consider this factor in its evaluation of the proposals.  Moreover, as we explained, the Air Force did not downgrade Hamilton's proposal for basing its LASS cart on \*\*\*.  Rather, Hamilton's proposal was downgraded for not providing a sufficient description of its proposed LASS cart.

As to the second point, we disagree with Hamilton's allegation that SESI's proposal did not provide any information about how its proposed LASS cart would comply with the mobility requirements.  We previously addressed this issue in our discussion of section 3.5 of the Purchase Description, and concluded that SESI's proposal provided a greater level of detail than Hamilton's proposal with respect to system mobility.  While Hamilton's proposal merely referenced \*\*\* in lieu of a description of its cart's compliance with the mobility requirements, SESI's proposal provided a more detailed description.  For example, SESI's proposal provided a chart reflecting the various requirements of the AS8090 specification.  The chart included various remarks about SESI's compliance with a particular section of the AS8090 specification, such as towing force, dimensions, springs and shocks, bumper, fenders, and mud-flaps.

D.     Post-Award Design Effort

The final type of unequal treatment alleged by Hamilton is the Air Force's evaluation of what Hamilton calls post-award design effort.  Hamilton believes that the Air Force considered the protestor's stated intent to defer finalization of the precise location of the LASS nameplate and operating instructions as a deficiency.  One of the requirements under Part (a) was to demonstrate compliance with section 3.3 of the Purchase Description.  Section 3.3.1 states that an "identification plate, permanently marked, shall be securely attached . . . in a readily accessible location."  AR at 146.  Additionally, section 3.3.3 instructed offerors that the "[o]perating instructions . . . will be

mounted either on the control panel door or another suitable location close to the control panel for easy viewing by the operator." *Id*. After an initial evaluation, the Air Force noted Hamilton's failure to respond to these requirements and other enclosure design requirements, including sections 3.3.8, 3.3.9, 3.3.10, and 3.3.11 of the Purchase Description. The Air Force directed Hamilton's attention to these sections of the Purchase Description in an evaluation notice, asked for a narrative description of the enclosure design, and allowed Hamilton four additional pages to respond.

Hamilton provided a short response, explaining that the "identification plate will be *** to the enclosure at a *** agreed location" and that the "operating instructions will be attached *** at a mutually agreed location ***." *Id*. at 325. The Air Force found Hamilton's response to these two items unacceptable because Hamilton "failed to provide a detailed description on [sic] the attachment and location of the identification plate" and Hamilton's response "did not provide firm and decisive information and the response was caveat [sic] with 'mutually agreed location.'" *Id*. at 1331.

Hamilton argues that while its proposal was downgraded for deferring compliance with requirements related to minor items — identification plate and control panel location — the Air Force did not downgrade SESI and HoveCo's proposals for "deferr[ing] compliance with far more critical RFP requirements until the post-award design phase." Pl.'s Mem. at 8. Specifically, Hamilton alleges that SESI deferred compliance with the towing speed requirement, foolproof design standard, and foreign object standard, and that HoveCo deferred compliance with certain design elements of its air flow system. We disagree.

The Air Force did not penalize Hamilton's proposal for deferring compliance with RFP requirements. Rather, Hamilton's proposal was unacceptable because it did not provide a narrative description of how its identification plate and operating instructions would comply with the requirements of the Purchase Description. The problem with Hamilton's proposal was thus a lack of information and not its promise to do something in the future. In order to confirm that Hamilton's proposal provided a sound and compliant approach, the Air Force needed to know whether Hamilton's identification plate would be in a readily accessible location and whether its operating instructions would be on or close to the control panel door. An undifferentiated promise to comply with general specifications provides insufficient information for the Air Force to know how those requirements will

be met.  SESI and HoveCo's proposals, by contrast, did provide the required locations of the plate and instructions.

Second, Hamilton is, in essence, attempting to compare two dissimilar evaluation items to support its argument of unequal treatment.  Instead of pointing to the content of other proposals with respect to the identification plate and operating instructions, Hamilton characterizes the issue as one of deferred compliance in general.  We believe it is inherently less persuasive to compare different components of the proposals for evidence of unequal treatment.

In any event, we disagree with Hamilton's fundamental contention that SESI and HoveCo "deferred compliance" with certain requirements.  Hamilton improperly focuses on SESI and HoveCo's use of the future tense in their proposals.  For example, Hamilton argues that SESI's proposal deferred compliance with the towing speed requirement because it stated that its "redesign of tank *will* allow system to go to 15 mph" and that the "system *will* be easily towable up to 15 mph," without further explanation.  AR at 782, 780 (emphasis added).   The RFP required only that offerors describe how their LASS units will be towable at speeds up to 15 miles per hour ("mph").  SESI stated that it was modifying the fuel tank in its baseline design to include ***. The Air Force was thus able to evaluate how SESI's proposed LASS unit would be towable at 15 mph, and was assured that SESI's proposal would comply with the specific requirements.  In contrast, the Air Force was not assured that Hamilton's proposed identification plate and operating instructions would be in an acceptable location because Hamilton refused to provide the locations.  Since SESI was not required to produce its first pre-production unit until it received its first task order, there was nothing improper with SESI indicating what it would do at some future point when the order is placed.

Hamilton argues that HoveCo's proposal also reflected an intention to address certain air flow system design issues only after award.  Hamilton bases its argument on an evaluation notice and HoveCo's response.  In the notice, the Air Force requested additional information about HoveCo's plan to integrate *** into its LASS unit.  HoveCo proposed the use of a *** for its LASS unit. The Air Force specifically wanted to know how HoveCo would mitigate the risk of incompatibility.  HoveCo responded by explaining that "very little" ***.  AR at 1224. *** *Id.* HoveCo went on and explained:

> Although there is very little risk with HoveCo's LASS design
> approach, the matter needing most attention is ***, but rather
> components which will be designed and fabricated specifically
> for the LASS, i.e., ***.  HoveCo personnel have considerable
> experience with the air management issues associated with the
> integration of ***.  HoveCo also plans to actively seek advice
> and counsel from *** engineers concerning the design of the air
> flow configuration as well as the design of the overall cart.

*Id.* Hamilton believes that HoveCo promised to defer compliance because its proposal stated that certain components "will be designed" and that HoveCo "plans to actively seek advice."

Hamilton is reading too much into HoveCo's response.  It was provided in the narrow context of the evaluation notice, which asked HoveCo to explain how it would mitigate any risks of integrating *** into its LASS system. HoveCo explained that integration of *** would be a special concern, and then described the use of *** personnel to minimize any risks associated with the integration. HoveCo's explanation of future activities was thus only in relation to integration risks.

Moreover, HoveCo's entire explanation was non-responsive to the Air Force's evaluation notice.  The Air Force's evaluation notice was limited in scope to the mobility system under Part (c).  Specifically, the Air Force only wanted assurance with respect to HoveCo's plan to integrate ***, not the integration of *** in HoveCo's air flow system.   HoveCo apparently misunderstood the evaluation notice.  Accordingly, the Air Force assessed a *** risk rating for Part (c) of  HoveCo's proposal for its failure to provide sufficient risk mitigation.  *See id.* at 1345-46.  The Air Force, therefore, appropriately penalized HoveCo's failure to respond to its specific request. More importantly, it is clear that HoveCo's technical proposal did not defer compliance with any requirements.

Hamilton also argues that SESI's proposal deferred compliance with sections 3.3.7 and 3.3.8 of the Purchase Description.  Section 3.3.7 required the LASS to be designed in an efficient manner with components designed in such a way that they can only be installed correctly.  Section 3.3.8 required certain loose components, such as caps, plugs, or pins, to be retained with a rope or lanyard to prevent "foreign object damage."   SESI's original proposal did not address how components would be designed to prevent improper

installation or foreign object damage.  As a result, the Air Force issued an evaluation notice to SESI requesting an explanation.  SESI responded in part:

> SESI will meet the requirements of paragraph 3.3.7 in the following manner.  We will complete a detailed drawing review of our basic existing drawing package with a view to ensure that no component, especially those removable for maintenance on a periodic basis, can be installed in any manner other than the correct manner.  Components identified that could not meet the "foolproof" requirement will be redesigned to meet the requirement.
>
>          . . . .
>
> Our methodology for meeting the requirements of PD paragraph 3.3.8 will be similar to that of the previous paragraph.  We will complete a review of the existing drawing package and bill of material to insure that any of the items in PD paragraph 3.3.8 have the proper retention component.  Any such component not having the proper retention capability will be redesigned.

*Id.* at 675.

We disagree with Hamilton's characterization that this constituted deferred compliance.  In fact, SESI's response indicated its intent to comply with the requirements and explained how it would ensure that its "existing" design complied with the requirements.  SESI's use of future tense does not amount to a failure to provide a technically acceptable proposal.  The first pre-production units would not be manufactured until after award.  Thus it was not inherently improper for SESI to describe its compliance with those sections in the future tense.

In sum, we are unpersuaded by Hamilton's allegations with respect to its deferred compliance.  Hamilton offered to use "mutually agreed" locations for the identification plate and operating instructions instead of proposing a specific location.  Even though these items may appear minor, the RFP instructed offerors to describe the design, including the location of the plate and instructions.  Without providing a location, the Air Force was unable to evaluate Hamilton's compliance with section 3.3.  SESI, on the other hand, provided an explanation of how it would prevent the improper installation of

components and foreign object damage. Although SESI indicated that noncompliant components, if identified, would need to be redesigned later, we believe the Air Force reasonably found SESI's explanation acceptable because it demonstrated how the proposed LASS would comply with the Purchase Description requirements.

To the extent, if any, that Hamilton's proposal was unfairly downgraded for deferring compliance with a minor Purchase Description requirement, we do not believe it was prejudicial. Part (a) of Hamilton's proposal was found unacceptable overall for other reasons in addition to the lack of information as to the location of the plate and instructions. Other deficiencies contributing toward the unacceptability of Part (a) included Hamilton's failure to provide sufficient discussions of the size and weight of its LASS unit and failure to provide a design plan of the chassis.

## CONCLUSION

There was a fundamental difference between Hamilton's proposal and the other proposals in the amount of information provided. Unlike its competitors, Hamilton consistently failed to detail by narrative description how its proposed LASS cart complied with the Purchase Description. Hamilton erroneously believed a promise to comply and generalized references to other LASS models were sufficient "narrative descriptions" from which the Air Force could evaluate its acceptability. After reviewing each of Hamilton's alleged instances of unequal treatment, we believe the Air Force reasonably and equitably evaluated the proposals. The Air Force notified Hamilton of its deficiencies through numerous evaluation notices, providing Hamilton additional opportunities to improve its proposal. The Air Force engaged in discussions with Hamilton in the same manner it did with the other offerors.

Given our rejection of plaintiff's argument of unequal treatment, it is unnecessary to consider defendant's independent argument that other aspects of plaintiff's proposal were so deficient that even if there were instances of

unequal treatment, plaintiff's proposal would have been unacceptable. Accordingly, we deny plaintiff's motion for judgment on the administrative record and request for injunctive relief, and grant defendant's cross-motion. The Clerk is directed to dismiss the complaint.  No costs.


 s/Eric G. Bruggink_____
ERIC G. BRUGGINK
Judge